UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

LOCK REALTY CORPORATION IX,    )
                                )
          Plaintiff             )
                                )
     v.                         )      CASE NO. 3:06-CV-487RM
                                )
U.S. HEALTH, LP, et. al.        )
                                )
          Defendants            )

<u>OPINION AND ORDER</u>

On January 1, 2002, Lock Realty Corporation IX entered into an agreement

with defendant U.S. Health, L.P., under which U.S. Health agreed to lease a

nursing home facility from Lock located on College Ave., Goshen, Indiana. The

lease was guaranteed by defendants Larry New, John Bartle, and Rebecca Bartle

and later was assigned by U.S. Health to defendant Americare Living Centers III,

LLC. Lock brought this action alleging breach of lease and breach of guaranties,

seeking immediate possession of the leased premises and damages. This matter

is before the court on Lock's third motion for partial summary judgment, the

defendants' cross-motion for summary judgment, a variety of motions to strike,

and the defendants' motion to reconsider the court's earlier summary judgment

order.

I. PROCEDURAL BACKGROUND

On September 11, 2006, this court granted Lock's motion for immediate

possession of the nursing home. (doc. # 15). Lock then moved for summary

judgment, alleging that the defendants breached the lease by assigning the lease to Americare without Lock's written consent and failing to pay rent for the months of June, July and August 2006. (doc. # 17). Lock sought damages for future rent in the amount of $10,291,817.73 pursuant to the savings clause in the lease agreement. On February 6, 2007, the court denied Lock's motion finding that the defendants' interpretation of the lease requiring a three-step damages calculation was more persuasive. (doc. # 102). Lock then moved for partial summary judgment seeking rental payments for June 1 through September 11, 2006 in the total amount of $371,249.30, plus prejudgment interest. (doc. # 137). The defendants responded that they owed Lock nothing because anything the defendants owed for past due rent was offset by escrow accounts, tax payments, consumables, and other assets of the defendants that Lock has benefitted from since taking possession of the facility. (doc. # 146). Lock responded that the defendants' right to setoff was waived because the defendants pleaded the affirmative defense of setoff for the first time in their answer that was filed five months late and after Lock had moved for partial summary judgment. (doc. # 164). On March 25, 2008, the court granted Lock's partial summary judgment motion for past due rent, finding that the defendants waived their right to assert the defense of setoff by failing to assert it in a timely filed answer. (doc. # 209).

Now before the court is Lock's third motion for partial summary judgment (doc. # 171) seeking future rental payments in the amount of $6,092,153 under the savings clause in the lease agreement and the court's February 6, 2007 order

interpreting that clause. The defendants filed a cross-motion for summary judgment (doc. # 212) seeking to limit Lock to liquidated damages or alternatively, a finding that Lock has no actual damages because the property's fair rental value exceeds the net rent payable under the lease. Also before the court are various motions to strike filed by both parties (docs. ## 189, 202, 205, and 221), Lock's motion to supplement evidence (doc. # 251) and the defendants' motion to reconsider this court's March 25 order denying them the right to assert setoff as an affirmative defense (doc. # 210).

## II. FACTUAL BACKGROUND

Compared to the procedural history of this case, the factual background is rather straightforward and, aside from the damages calculation, is largely undisputed. On January 1, 2002, U.S. Health entered into a twenty-year lease with Lock for the possession of a nursing home in Goshen, Indiana to commence in April 2002 and end in March 2022. Mr. New, Mr. Bartle, and Ms. Bartle guaranteed the lease, which was subsequently assigned to Americare. At the same time, the parties also executed another lease that encompasses some 3.695 acres of real estate and comprises part of the parcel upon which the facility was built. Lock leased the adjacent property to the defendants so they could construct and operate "an assisted living facility . . . to be operated in conjunction with the Nursing Home[.]" (Lease Agreement, p. 1). The two leases are referred to as the Nursing Home Lease and Ground Lease, respectively. The Ground Lease provided

that it would terminate by its own terms if an assisted living facility wasn't constructed within 72 months of the commencement date. Lock derived all of its net rent from the Nursing Home Lease; net rent from the Ground Lease was one dollar per year for twenty years and wouldn't increase in the event an assisted living facility was constructed.

Before the defendants could build an assisted living facility, they had to have the property re-zoned, which they accomplished in late 2005. Both leases acknowledge that the property was the subject of a re-zoning proceeding and stated that at the conclusion of such proceeding, the landlord and the tenant "shall execute a mutually agreeable addendum to this Lease, setting forth the permanent description of the real estate which is the subject of this Lease." (Nursing Home Lease and Ground Lease, Ex. A). The defendants never began construction of the assisted living facility after getting the property re-zoned. This action ensued instead.

The defendants breached the lease agreement by assigning it to Americare without Lock's written consent and/or by failing to pay for rent from June 1 through September 11, 2006 in the total amount of $371,249,30. An event of default under either the Nursing Home Lease or Ground Lease terminates both leases. The defendants vacated the leased premises on September 14, 2006. The defendants don't contest the breach of lease; they only dispute the amount of damages Lock is entitled to receive as a result of the breach. The lease payments were $92,882.11 per month at the time of the breach. The remaining term of the

lease was 186 months and 17 days. The savings clause in the lease agreement states:

> The termination of this Lease by Landlord shall not affect Tenant's liability for Net Rent and other charges accruing or coming due thereafter and in such event, Tenant shall remain liable to Landlord for all damages provided for in law and under this Lease resulting from Tenant's breach including, without limitation, the difference between the aggregate Net Rents reserved under the terms of this Lease for the balance of the term of the Lease together with all other sums payable hereunder as Net Rent for the balance of the term of the Lease, less the fair rental value of the Leased Premises for that period determined as of the date of such termination, which Net Rent shall automatically accelerate and become immediately due and payable. For purposes of this paragraph, Tenant shall be deemed to include any guarantor or surety of the Lease.

(Nursing Home Lease, ¶ 25(C)(3)). In its February 6, 2007 order (doc. # 102), the court agreed with the defendants that this clause requires the following three-step damages calculation: "(1) the remaining net rent must be calculated by an expert qualified to testify on the consumer price index and present discount values; (2) an expert qualified to testify as to the lease's fair market value for the period of net rent must be determined; (3) the second number must be deducted from the first to determine whether any damages were sustained." The lease also provides for the recovery of reasonable costs and attorney fees to the prevailing party. (Nursing Home Lease, ¶ 17).

Lock's expert, Jean L. Tipton, calculated a fair rental rate of $660,000 for 2006 ($55,000 per month), annual rent increase of 3.07 percent, and a discount rate of 4.99 percent for the time value of money. Based on these figures, Ms. Tipton determined the remaining net rent payable under the lease (discounted to

present value) as $14,937,182 and the fair rental value of the property for the remaining period of the lease (discounted to present value) as $8,845.030, for a difference of $6,092,153.

In support of its motion for summary judgment, the defendants submit the expert report of Bonnie Mitchell, who calculated a fair rental rate of $1,351,995 for 2007 ($112,666 per month).[1] Using Ms. Mitchell's figure for fair rental value, annual rent increase of 3.07 percent, and a discount rate of 4.99 percent, the defendants' expert, Greg Jurgonski, calculated the remaining net rent payable under the lease (discounted to present value) as $14,937,182 and the fair rental value of the property for the remaining period of the lease (discounted to present value) as $17,576,950. Based on this, the defendants contend that the lease's fair market value exceeds the remaining aggregate net rent due under the lease. Using

---

[1]In response to Lock's motion for summary judgment, the defendants attached the expert report of Louis Jackson. As noted by Lock, Mr. Jackson's report isn't verified or sworn, and as such, isn't properly before this court. Scott v. Edinburg, 346 F.3d 752, 759 (7th Cir. 2003); *see also* Howmedica Osteonics Corp. v. Tranquil Prospects, Ltd., No. 3:02-CV-321, 482 F. Supp. 2d 1045, 1057 (N.D. Ind. March 28, 2007) ("An unsworn and unverified expert report is not Rule 56 evidence that may be relied upon to overcome a motion for summary judgment."). Although Ms. Mitchell's and Mr. Jurgonski's reports submitted in support of the defendants' motion for summary judgment were also unsworn and unverified, they corrected this deficiency by later filed affidavits. *See* Harpold v. Ethicon Endo-Surgery, Inc., No. 1:06-CV-1666, 2009 WL 688984, at *1 (S.D. Ind. March 11, 2009) (finding that where the plaintiff submitted the expert affidavit after filing its motion for summary judgment, "[t]he belated affidavit was sufficient to support the use of the report at the summary judgment stage."); Maytag Corp. v. Electrolux Home Prods., Inc., 448 F. Supp. 2d 1034, 1064 (N.D. Iowa 2006) (concluding "that subsequent verification or reaffirmation of an unsworn expert's report, either by affidavit or deposition, allows the court to consider the unsworn expert's report on a motion for summary judgment.").

these figures, Lock wouldn't be entitled to actual damages for future rental payments.

Before inception of the lease, the defendants paid monies into certain escrow accounts for the facility, which they contend Lock currently has in its possession. Pursuant to the lease, the defendants paid a security deposit to Lock in the amount of $212,703.96. (Nursing Home Lease, ¶ 32). The escrow amount also consists of a replacement reserve which was created incident to paragraph 25.5 of the lease agreement and "shall be treated as an additional Security Deposit." (Nursing Home Lease, ¶ 25.5). Paragraph 32 of the lease agreement provides that if the lease is terminated by the event of a default, the defendants' "Security Deposit shall at the option of [Lock] and in addition to any other remedies of [Lock] be retained by [Lock] as part of liquidated damages, and not as a penalty." (Nursing Home Lease, ¶ 32). In September 2006, the real estate escrow account amounted to $416,328.25.

Upon ejectment, this court allowed Lock to purchase from the defendants any and all supplies and consumables at the nursing home. The parties agreed that the defendants are owed $63,000 for the supplies and consumables that Lock retained and the court ordered that Lock may apply the $63,000 against any judgment entered in this action (doc. # 267). Additionally, before defendants were ejected from the premises, they prepaid taxes on the property and the defendants contend that Lock has received payment for services the defendants rendered to the residents of the nursing home.

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In deciding whether a genuine issue of material fact exists, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). No genuine issue of material fact exists when a rational trier of fact couldn't find for the nonmoving party even when the record as a whole is viewed in the light most favorable to the nonmoving party. Crull v. Sunderman, 384 F.3d 453, 459-460 (7th Cir. 2004). "The mere existence of an alleged factual dispute will not defeat a summary judgment motion; instead, the nonmovant must present definite, competent evidence in rebuttal." Butts v. Aurora Health Care, Inc., 387 F.3d 921, 924 (7th Cir. 2004).

The moving party may discharge its "initial responsibility" by simply "'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). When the nonmoving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. Green v. Whiteco Indus.,

Inc., 17 F.3d 199, 201 n. 3 (7th Cir. 1994). "[T]he movant need only inform the court of the basis of the motion and identify relevant portions of the record which it believes demonstrate the absence of a genuine issue of material fact." Celotex v. Catrett, 477 U.S. at 323. The party with the burden of proof on an issue must show that there is enough evidence to support a verdict in his favor. Lawrence v. Kenosha County, 391 F.3d 837, 842 (7th Cir. 2004); *see also* Johnson v. Cambridge Indus., Inc., 325 F.3d 892, 901 (7th Cir. 2003) ("As we have said before, summary judgment 'is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.'" (citation omitted)). Summary judgment is appropriate if the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial. Ortiz v. John O. Butler Co., 94 F.3d 1121, 1124 (7th Cir.1996).

When cross motions for summary judgment confront the court, it must consider each party's motion individually to determine if that party has satisfied the summary judgment standard. McKinney v. Cadleway Props., Inc., 548 F.3d 496, 504 n. 4 (7th Cir. 2008) ("The motions are treated separately.") (citations omitted); *see also* Midwest Title Loans, Inc. v. Ripley, 616 F. Supp. 2d 897, 902 (S.D. Ind. 2009) ("[C]ourts must consider each party's motion individually to determine if that party has satisfied the summary judgment standard."). The standard for determining whether summary judgment should issue is unchanged

from that which applies when only a single party has moved for the relief. McKinney v. Cadleway Props., Inc., 548 F.3d at 500.


IV. Motion to Supplement

On October17, 2008, after its third motion for partial summary judgment was fully briefed, Lock moved to supplement its designation of evidence to include Notices of Audit Rates issued by Meyers & Stauffer LC, the Indiana Family and Social Services Agency rate-setting contractor. (doc. # 251). Lock submitted the Notices of Audit Rates as exhibits to the affidavit of Meyers & Stauffer employee Robert Schafer. The audit rates were issued on August 29, 2008 and include fair rental values for the nursing home facility for 2003 and 2004. For the year ending December 31, 2004, the rate was $622,510, which equals a monthly rate of $51,875.83. Lock wants permission to supplement its designation with the reports pursuant to Federal Rule of Civil Procedure 56(e)(1) because the audit rates weren't available when it filed its summary judgment motion.

The defendants object, stating Rule 56(e) doesn't contemplate supplemental reports and that Mr. Schafer wasn't disclosed as a witness. The deadline for expert witness disclosures passed on January 11, 2008 and the discovery deadline passed on April 11, 2008. Because Mr. Schafer was previously undisclosed, the defendants contend late disclosure would prejudice them; they had no opportunity to depose or serve written discovery on him or otherwise engage in discovery to test the report's validity.

Rule 56(e) provides in pertinent part that the "court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or additional affidavits." FED. R. CIV. P. 56(e). The court declines to allow Lock to supplement its summary judgment motion at this stage in the litigation. The deadline for discovery passed long ago, and to allow Lock to introduce evidence when defendants haven't had the opportunity to conduct discovery with respect to the report would unfairly prejudice the defendants. They have no ability to address the reliability of the report or its relevancy to the issues in this case. The court therefore DENIES Lock's motion to supplement (doc. # 251).

## V. LOCK'S MOTION FOR SUMMARY JUDGMENT

In Lock's present motion for partial summary judgment (doc. # 171), Lock seeks accelerated net rent under the terms of the lease in the amount of $6,092,153 and attaches Ms. Tipton's affidavit to support its claim for damages. The defendants respond that Lock has suffered no damages and in support, they attach the expert reports of Louis Jackson and Gregory Jurgonski. The defendants also filed a sur-response attaching the expert opinion of Bonnie Mitchell to further support its defense that Lock has suffered no damages. The defendants move to strike Ms. Tipton's report (doc. # 202) and Lock moves to strike Mr. Jackson's and Mr. Jurgonski's reports (doc. # 189) and the defendants' sur-response (doc. # 205).

## A. *Savings Clause - Three-Step Damages Calculation*

The general rule is that "a tenant will be relieved of any obligations to pay further rent if the landlord deprives the tenant of possession and beneficial use and enjoyment of any part of the demised premises by an actual eviction." <u>Nylen v. Park Doral Apart.</u>, 535 N.E.2d 178, 181 (Ind. Ct. App. 1989) (citations omitted). "[A]n exception to the general rule exists when the lease includes a savings clause expressly providing that termination shall not affect the accrual of liability for rent." <u>Id.</u> (citations omitted); *see also* <u>Gigax v. Boone Village Ltd. P'ship</u>, 656 N.E.2d 854, 859 (Ind. Ct. App. 1995).

The lease between Lock and U.S. Health, New, Mr. Bartle, and Ms. Bartle has such a clause. It states:

> The termination of this Lease by Landlord shall not affect Tenant's liability for Net Rent and other charges accruing or coming due thereafter and in such event, Tenant shall remain liable to Landlord for all damages provided for in law and under this Lease resulting from Tenant's breach including, without limitation, the difference between the aggregate Net Rents reserved under the terms of this Lease for the balance of the term of the Lease together with all other sums payable hereunder as Net Rent for the balance of the term of the Lease, less the fair rental value of the Leased Premises for that period determined as of the date of such termination, which Net Rent shall automatically accelerate and become immediately due and payable. . . .

(Nursing Home Lease, ¶ 24.5(C)(3)). The lease has been terminated as a result of the defendants' breach, so Lock is entitled to future net rent, less the fair rental value of the leased premises. In its February 6, 2007 order, the court found that this clause requires the following three-step damages calculation: "(1) the remaining net rent must be calculated by an expert qualified to testify on the

consumer price index and present discount values; (2) an expert qualified to testify as to the lease's fair market value for the period of net rent must be determined; (3) the second number must be deducted from the first to determine whether any damages were sustained." (doc. # 102).

Resolution of Lock's motion for partial summary judgment will depend on resolution of the parties' motions to strike, so the court will turn its analysis to those motions.

### B. *Lock's Motion to Strike the Defendants' Sur-Response*

Lock moved to strike the defendants' sur-response in opposition to Lock's third motion for summary judgment as untimely (doc. # 205). The defendants had until November 2, 2007 to file a supplemental response to Lock's partial motion for summary judgment, but filed no response until January 7, 2008, sixty-five days past the deadline. The defendants contend that they filed their sur-response late because Lock wasn't cooperating with discovery requests and believed they could submit a supplemental response after discovery responses were received.

The court doesn't find that the defendants' reason for filing a late response constitutes excusable neglect within the context of Federal Rule of Civil Procedure 6(b). If the defendants needed additional time, they should have requested that by filing a motion. Further, the sur-response would prejudice Lock because it raises new issues that could have been addressed in the defendants' response. The court GRANTS Lock's motion to strike the defendants' sur-response (doc. # 205). *See*

Anderson v. Atlas Van Lines Intern. Corp., 129 F. 3d 119 (7th Cir. 1997) (Table) (affirming district court's decision to strike untimely response brief in opposition to summary judgment motion).

C. *The Defendants' Motion to Strike Certain Portions of Jean Tipton's Report*

The defendants move to strike certain portions of Jean Tipton's report (doc. # 202) contending that she isn't an expert in the long term health care industry and her opinions as to fair market value of the lease are unreliable. The defendants further contend that Lock didn't comply with Federal Rule Civil Procedure 26(a) in disclosing Ms. Tipton.

The defendants' motion to strike was filed on January 7, 2008, almost five months after the defendants filed their response to Lock's third motion for summary judgment. The motion to strike is untimely and the defendants don't justify their untimeliness. Still, because Lock had an opportunity to respond to the motion to strike, it wasn't unduly prejudiced by the late filed motion. Further, the court may consider the admissibility of expert testimony *sua sponte*. Lewis v. CITGO Petroleum Corp., 561 F.3d 698, 704 -705 (7th Cir. 2009).

1. *Rule 26(a) Disclosure Requirements.*

Rule 26(a)(2) requires the parties to disclose the identify of all expert witnesses the parties intend to call within the time frame set by the court. FED. R.

CIV. P. 26(a)(2)(C). In addition to requiring the identify of expert witnesses, Rule 26(a)(2) requires parties to disclose:

> a written report - prepared and signed by the witness-... contain[ing]: (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the data or other information considered by the witness ...; (iii) any exhibits that will be used ...; (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years; (v) a list of all other cases in which, during the previous four years, the witness testified as an expert ...; and (vi) a statement of the compensation to be paid. . . .

FED. R. CIV. P. 26(a)(2)(B). Ms. Tipton was disclosed in Lock's initial disclosures and her report was attached to Lock's third partial summary judgment motion filed with this court on July 17, 2007, well before the January 11, 2008 deadline for filing expert disclosures. Lock timely disclosed Ms. Tipton as an expert witness.

The defendants further contend that Ms. Tipton didn't disclose her publications or cases in which she has testified. Ms. Tipton disclosed her publications, but she only disclosed the types of cases in which she has testified. This is insufficient pursuant to Rule 26(a)(2)(B)(v), which requires a list of the cases during the previous four years where the witness testified as an expert. Because the defendants first addressed this deficiency in their own summary judgment motion and not in response to Lock's motion for partial summary judgment or their motion to strike Ms. Tipton's report, the court declines to strike Ms. Tipton's report on this basis.

## 2. *Admissibility under Daubert*

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993). <u>Naeem v. McKesson Drug Co.</u>, 444 F.3d 593, 607 (7th Cir. 2006). Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. <u>Daubert</u> requires the trial court to act as a gatekeeper in screening the admissibility of expert testimony by determining whether the proffered testimony is reliable and relevant. <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 147 (1999). The <u>Daubert</u> standard applies to all expert testimony or evidence, whether it relates to areas of traditional scientific competence, engineering principles or other technical or specialized expertise. <u>Kumho Tire v. Carmichael</u>, 526 U.S. at 147.

An expert's reliability depends on both the expert's qualifications and the expert's methodology. <u>Smith v. Ford Motor Co.</u>, 215 F.3d 713, 718 (7th Cir. 2000); <u>United States v. Parra</u>, 402 F.3d 752, 758 (7th Cir. 2005). "While 'extensive academic and practical expertise' in an area is certainly sufficient to qualify a potential witness as an expert, 'Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience.'" <u>Smith v. Ford</u>

16

Motor, 215 F.3d at 718 (internal quotation marks and citations omitted). "[A] court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." Smith v. Ford Motor, 215 F.3d at 718. A witness needn't put forth testimony in a scientific or technical manner to be considered an expert. Tuf Racing Prod., Inc. v. Am. Suzuki Motor Corp., 223 F.3d 585, 591 (7th Cir. 2000).

Gate-keeping courts use four non-exclusive factors when assessing reliability: 1) the extent to which the theory has been or can be tested; 2) whether the theories have been subjected to peer review and/or publication; 3) the theories' known or potential rate of error; and (4) the general acceptance of the theory in the relevant scientific or professional community. Chapman v. Maytag Corp., 297 F.3d 682, 687 (7th Cir. 2002) (citation omitted). Courts use these criteria "to make certain that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire v. Carmichael, 526 U.S. at 152. Rule 702 is flexible and no single factor is required in the analysis or dispositive as to its outcome. Kumho Tire v. Carmichael, 526 U.S. at 141. "The flexibility of the inquiry is particularly important to keep in mind when the field of expertise is not a scientific one . . . ." Abrams v. Van Kampen Funds, Inc., No. 01-C-7538, 2005 WL 88973, at *5 (N.D. Ill. Jan. 13, 2005).

"The question of whether the expert is credible or whether his or her theories are correct given the circumstances of a particular case is a factual one that is left for the [trier-of-fact] to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based." <u>Smith v. Ford Motor Co.</u>, 215 F.3d at 719 (*citing* <u>Walker v. Soo Line R. Co.</u>, 208 F.3d 581, 589-590 (7th Cir. 2000)). The trial court doesn't decide whether the expert's opinion is correct but is instead "limited to determining whether expert testimony is pertinent to an issue in the case and whether the methodology underlying that testimony is sound." <u>Id.</u> (citation omitted). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." <u>Daubert v. Merrell Dow</u>, 509 U.S. at 596.

If this case proceeds forward, it will be decided at a bench trial, in which a court's gate-keeping function applies with less force.

> Where the gatekeeper and the factfinder are one and the same-that is, the judge-the need to make such decisions prior to hearing the testimony is lessened. That is not to say that the scientific reliability requirement is lessened in such situations; the point is only that the court can hear the evidence and make its reliability determination during, rather than in advance of, trial. Thus, where the factfinder and the gatekeeper are the same, the court does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702.

<u>In re Salem</u>, 465 F.3d 767, 777 (7th Cir. 2006); *see also* <u>United States v. Ozuna</u>, 561 F.3d 728 (7th Cir. 2009) ("Judges . . . are less likely to be swayed by experts

with insufficient qualifications."). "[T]he judge in a bench trial may choose to allow the presentation of borderline testimony, subject the testimony to rigors of cross-examination, and decide later whether the testimony is entitled to some consideration or whether it should be excluded as irrelevant, unreliable, or both." <u>Mintel Int'l Group, LTD v. Neergheen</u>, No. 08-C-3939, 2009 WL 1033357, at *2 (N.D. Ill. April 17, 2009)). Although a judge in a bench trial has discretion to admit questionable evidence, she must not give it more weight than it deserves. <u>Seaboard Lumber Co. v. United States</u>, 308 F.3d 1283, 1302 (Fed. Cir. 2002) (finding that the <u>Daubert</u> standards of relevance and reliability must still be met in a bench trial).

"The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the <u>Daubert</u> standard." <u>Lewis v. CITGO Petroleum</u>, 561 F.3d at 705 (*citing* FED. R. EVID. 702, advisory committee's note (2000 Amends.)). The rejection of expert testimony is the exception, not the rule; "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." FED. R. EVID. 702, advisory committee's notes (2000 Amends.).

The defendants first contend that Ms. Tipton isn't qualify to give an opinion on the valuation of a nursing home because she admittedly isn't an expert in the long term health care industry. Lock responds that Ms. Tipton holds a bachelor degree in economics from Purdue University, became a certified public accountant in 1973, has an accredited senior appraiser certificate, is accredited in business

valuation from the American Institute of CPAs, and has taken numerous courses on valuation. Ms. Tipton is the director in charge of valuation and litigation support services for Baden, Gage & Schroder, a CPA and business consulting firm in Fort Wayne. During her career, Ms. Tipton has prepared more than 500 business valuations for various purposes, given numerous lectures, and serves as a panelist for discussions related to business valuations.

Although Ms. Tipton isn't an expert in the health care industry, she has significant experience in valuating businesses. Several "[d]istrict courts in the Seventh Circuit have qualified witnesses as experts even though they did not specialize or have experience in the particular product or field involved in the case." Superior Aluminum Alloys, LLC v. United States Fire Ins. Co., No. 1:05-CV-207, 2007 WL 1850860, at *5 (N.D. Ind. June 25, 2007), and cases cited therein. But see MDG Int'l, Inc. v. Australian Gold, Inc., No. 1:07-CV-1096, 2009 WL 1916728. at *3 (S.D. Ind. June 29, 2009) (finding that even though the proffered expert had extensive experience valuing public companies, he lacked expertise and experience to qualify as an expert in the area of valuing closely held businesses); see also In re Williams Sec. Litig., 496 F. Supp. 2d 1195, 1244 (N.D. Okla. 2007) (finding that the proffered  expert was inadmissible because he didn't have industry-specific qualifications). The unique and specialized nature of the health care industry might affect the weight of Ms. Tipton's opinion testimony, but her extensive education, experience and credentials in the valuation of businesses provide her with the skills to reliably determine the rental value of a nursing home

upon examination of objective factors. Ms. Tipton is qualified to give an opinion in this matter and concerns relating to her qualifications are better addressed on cross-examination.

The reliability of Ms. Tipton's methodology is a separate issue. Ms. Tipton opined that the fair market lease rate is $55,000 and bases her opinion on: (1) an e-mail from defendant John Bartle, dated August 16, 2006, in which he proposes that the rent be reduced to $65,000 per month; (2) an e-mail string between American Senior Communities and William Centers in which ASC offers an annual lease payment between $500,000 and $600,000; and (3) the monthly fair rental value as defined in 405 IAC 1-14.6-12 calculated to be $57,388 as of September 2006.

Three kinds of valuation methods generally are used to determine fair market value of real property, "and each has it analog in determining the fair rental value of the property." Procacci v. Comm'r, 94 T.C. 397, 407, 422 (1990). Those three methods are (1) the comparable sales method, (2) the income method, and (3) the cost method. Estate of Stevens v. Comm'r, 79 T.C.M. (CCH) 1519, at *4 (2000) (citations omitted); Bruzewicz v. United States, 604 F. Supp. 2d 1197, 1208 (N.D. Ill. 2009) (listing the three methods as sales comparison, income capitalization and replacement cost); see also State v. Bishop, 800 N.E.2d 918, 923-924 (Ind. 2003) (stating that these three approaches are widely used in estimating fair market value of property taken by eminent domain and that "[i]n the appraisal of real estate, any one or all three of these approaches to estimate

the fair market value may be applied.") (citations omitted); <u>Scott-Reitz Ltd. v. Rein</u> <u>Warsaw Assoc.</u>, 658 N.E.2d 98, 105 (Ind. Ct. App. 1995) ("All three have been approved by this Court as a method of determining a property's fair market value."). Experts generally will use some combination of the methods for verification. <u>Annon II Inc. v. Rill</u>, 597 N.E.2d 320, 327-328 (Ind. Ct. App. 1992) (citation omitted).

The comparable sales approach, also known as the market data approach, may be the most commonly employed method and involves a comparison between the subject property and "comparable" pieces of property (usually several in number). *See* <u>City of Carmel v. Leeper Elec. Servs., Inc.</u>, 805 N.E.2d 389, 396 (Ind. Ct. App. 2004) (stating that this approach looks to recent sales of comparable property in the market and is a widely accepted method). "The analogous approach in determining fair market rental value is to consider rents paid under leases of similar properties." <u>Procacci v. Comm'r</u>, 94 T.C. at 422. The income approach is the "value which the property's net earning power will support based upon the capitalization of net income." <u>City of Carmel v. Leeper Elec.</u>, 805 N.E.2d at 396. "[I]n determining fair market rental value, the cash-flow profit which the [facility] is likely to generate is estimated, and is divided between the lessor and lessee as rent and operating profit, respectively." <u>Procacci v. Comm'r</u>, 94 T.C. at 423. Finally, under the cost approach method, the expert considers "the current cost of reproducing the property less deprecation from all sources." <u>City of Carmel v. Leeper Elec.</u>, 805 N.E.2d at 396. "Fair rental value is . . . determined as the

amount of rent necessary to provide the owner with a return on the property equal to a certain percentage of the real estate value." Procacci v. Comm'r, 94 T.C. at 421.

The court shares defendants' reservations about Ms. Tipton's methodology. The most appropriate valuation of the College Avenue facility likely would involve some combination of the three methods outlined above. *See e.g.*, In re Integrated Health Serv., Inc., 289 B.R. 32, 37 (D. Del. 2003) (finding expert's methods reliable in valuing fair market rental value of nursing home where he compared the rent to projected earnings and reviewed market comparable). Ms. Tipton relies on two rental offers and the medicaid formula, but she doesn't indicate that she reviewed any comparable lease values and aside from her calculation of the medicaid rate, didn't perform a cost or income approach analysis.

Lock rejected the offers it received from Mr. Bartle and ASC and nothing in the summary judgment record suggests that Lock thought those offers represented fair rental value. Nor is there any evidence that Lock sought any additional offers. Further, the Administrate Code provides a formula for compensating Medicaid providers in nursing facilities. Ms. Tipton doesn't explain how the Medicaid formula applies in deciding the fair market value for a lease between private companies, nor does she provide the figures she used to calculate the rate. "An expert must offer good reason to think that [her] approach produces an accurate estimate using professional methods, and this estimate must be testable. Someone else using the same data and methods must be able to replicate

the result." <u>Zenith Elec. Corp. v. WH-TV Broad. Corp.</u>, 395 F.3d 416, 419 (7th Cir. 2005). Finally, there is no explanation how Ms. Tipton arrived at the $55,000 figure based on the emails and medicaid rate. Opinions that only offer bottom line conclusions don't assist the trier of fact and should not be admitted. <u>Id.</u>

The court isn't persuaded that two unaccepted offers and a bottom line calculation using the medicaid formula constitute information upon which experts generally rely in formulating fair rental value reports of nursing home facilities between private entities. Nothing in the record supports a finding that Ms. Tipton relied on generally accepted methods used for valuing property and there is no explanation justifying the reliability of her methodology. Further, because Ms. Tipton only asserts bottom line conclusions without explanation, her opinion cannot be tested for accuracy. Accordingly, the court finds that Ms. Tipton's opinion as to fair rental value is unreliable and GRANTS the defendants' motion to strike those portions of her report (doc. # 202).

Without an expert that can opine as to the value of the property, Lock cannot succeed on summary judgment. *See* <u>Andrews v. E.I. Du Pont De Nemours & Co.</u>, 447 F.3d 510, 516-517 (7th Cir. 2006) (affirming district court's order granting summary judgment for the defendant after striking the plaintiff's expert because without expert testimony he couldn't establish proximate cause.); <u>Multimatic, Inc. v. Faurecia Interior Sys. USA, Inc.</u>, No. 05-60120, 2007 WL 627874, at *7-8 (E.D. Mich. 2007) (finding that the plaintiff couldn't use evidence

of its damages at trial and having no evidence of damages, the plaintiff couldn't prevail on its claims as a matter of law).

## VI. *The Defendants' Motion for Summary Judgment*

The defendants filed a summary judgment motion (doc. # 212) asserting that the undisputed evidence shows that Lock suffered no damages because the fair rental value of the property exceeds the accelerated net rent due under the lease. In support of its motion, the defendants attach reports of Bonnie Mitchell and Greg Jurgonski. Lock moved to strike Ms. Mitchell's and Mr. Jurgonski's reports (doc. # 221) and points to Ms. Lipton's report to support its claim of damages.

Because the court struck Ms. Tipton's report and the record contains no other evidence of Lock's damages sufficient to allow a jury to find in its favor, the court needn't address the admissibility of the defendants' experts. The moving party may discharge its "initial responsibility" by simply "'showing' — that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325. When the nonmoving party would have the burden of proof at trial, the moving party isn't required to support its motion with affidavits or other similar materials negating the opponent's claim. Green v. Whiteco Indus., Inc., 17 F.3d 199, 201 n. 3 (7th Cir.1994). The party with the burden of proof on an issue must show that there is enough evidence to

support a verdict in his favor. Lawrence v. Kenosha County, 391 F.3d 837, 842 (7th Cir. 2004).

The defendants properly raised the issue of damages and Lock had the burden to come forth with admissible evidence to support its claim for future rent. Because Lock has the burden at trial to show damages and hasn't come forth with any admissible evidence of actual damages, Lock is limited to recovery of liquidated damages. *See* Barrett v. Atlantic Richfield Co., 95 F.3d 375, 383 (5th Cir. 1996) (after striking the plaintiff's expert and determining that the plaintiffs failed to provide summary judgment evidence in support of their claims, the district court properly granted summary judgment in favor of the defendants).

The court previously found that Lock is entitled to $371,249,30 plus prejudgment interest for past due rent, but now finds that its damages for future rent are limited to the security deposit and replacement reserve, referred to generally as escrow accounts. (Nursing Home Lease, ¶¶ 32 and 25.5). Paragraph 25.5 states that "funds in the Replacement Reserve shall be treated as an additional Security Deposit." (Nursing Home Lease, ¶ 25.5). Paragraph 32 of the lease provides that if "this Lease shall be terminated as a result of an Event of Default by [the defendants], then [the defendants'] Security Deposit shall at the option of [Lock] and in addition to any other remedies of [Lock] be retained by [Lock] as part of liquidated damages, not as a penalty." (Nursing Home Lease, ¶ 32). Lock is entitled to retain the security deposit, but isn't entitled to additional recovery for actual damages.

The defendants' motion for summary judgment is GRANTED (doc. # 212) and the court DENIES Lock's motion to strike Ms. Mitchell and Mr. Jurgonski's report (doc. # 221) as moot.

## VII. THE DEFENDANTS' MOTION TO RECONSIDER

Motions to reconsider "serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." Caisse Nationale de Credit Agricole v. CBI Indus., Inc., 90 F.3d 1264, 1269 (7th Cir.1996) (citations omitted). On reconsideration, a party may not introduce new evidence or legal theories that could have been presented earlier or simply rehash previously rejected arguments. Id. The standard for motions to reconsider are relaxed when the order in question was interlocutory, as in this case. Federal Rule of Civil Procedure 54 provides that interlocutory orders "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." FED. R. CIV. P. 54(b); see Duffin v. Exelon Corp., No. 06-C-1382, 2007 WL 1385369, at *2 (N.D. Ill. May 4, 2007) ("The court also has inherent authority to reconsider interlocutory orders before entering final judgment.") (citations omitted); see also Moses H. Cone Mem. Hosp. v. Mercury Const. Corp., 460 U.S. 1, 12 (1983) ("[E]very order short of a final decree is subject to reopening at the discretion of the district judge"); First Am. Kickapoo Operations, LLC v. Multimedia Games, Inc., 412 F.3d 1166, 1170 (10th Cir. 2005) (noting that the court retains the power to modify its rulings until final judgment is entered); Fisher v. Nat'l R.R.

Passenger Corp., 152 F.R.D. 145, 149 (S.D. Ind.1993) ("[I]t is well established that a district court has the inherent power to reconsider interlocutory orders and reopen any part of a case before entry of final judgment.") (*citing* Marconi Wireless Tel. Co. v. United States, 320 U.S. 1, 47-48 (1943)). "[A] motion to reconsider an interlocutory order may be entertained and granted as justice requires." Akzo Coatings, Inc. v. Aigner Corp., 909 F. Supp. 1154, 1160 (N.D. Ind.1995) (citations omitted).

The defendants ask the court to reconsider its March 2008 finding that the defendants waived their right to assert setoff. They contend that this ruling constitutes an error of misapprehension and fails to recognize that the answer and affirmative defenses were filed before the deadline this court established for amending the pleadings. The defendants further contend that the order failed to recognize that the affirmative defenses were raised and supported by affidavit in the defendants' response to Lock's first summary judgment motion. Finally, the defendants contend that the court should reconsider its opinion and order because it constitutes a decision made outside the adversarial issues the parties presented because Lock didn't move to strike the answer and affirmative defenses.

When Lock filed its second motion for partial summary judgment, the defendants hadn't filed an answer or raised any affirmative defenses. The defendants contend that because they filed their answer before the deadline for filing amendments to the pleadings had passed, that they timely filed their answer and affirmative defenses. This isn't so. The court denied the defendants' motion

to dismiss on January 29, 2007, and the defendants had ten days from that date to file an answer. Fed. R. Civ. P. 12(a)(4)(A). They didn't file their answer until June 12, 2007, so it was untimely.

The defendants contend that as of November 22, 2006, Lock knew of their intent to raise setoff as an affirmative defense because they raised the defense in response to Lock's first motion for summary judgment. Lock's reply on its first summary judgment motion acknowledged that the defendants were arguing for a setoff or a counterclaim, but noted that they didn't plead either defense. Lock stated that "[s]uch claims are typically made via an affirmative defense or counterclaim, neither of which the Defendants have plead." (doc. 83, p. 6). Lock was aware of the defense and informed the defendants of the requirement to file an answer with an affirmative defense, but the defendants still didn't file an answer until after Lock filed its second motion for partial summary judgment.

The defendants argue that they were entitled to assert the affirmative defense of setoff because neither Lock nor the court has indicated how Lock has suffered prejudice. Setoff and recoupment are often plead as affirmative defenses, but such claims can (and perhaps should) be set forth separately in a counterclaim. *See* Coplay Cement Co., Inc. v. Willis & Paul Group, 983 F.2d 1435, 1440 (7th Cir. 1993). Recoupment applies when the plaintiff's debt to the defendant arises out of the same transaction; setoff applies when the debt arises from a separate transaction. Id. (describing setoff as the ancestor of the permissible counterclaim and recoupment as the ancestor of the compulsory

counterclaim); *see also* <u>American Mgmt. v. MIF Realty, L.P.</u>, 666 N.E.2d 424, 432 (Ind. App.1996) (explaining that a "set-off" is a "counter-action *against the plaintiff* and grows out of matter *independent* of [the plaintiff's] cause of action") (citations omitted). "A claim for setoff or recoupment is not technically a 'defense' at all, but must be plead as a counterclaim pursuant to Rule 13." <u>Ace Hardware Corp. v. Marn, Inc.</u>, No. 06-CV-5335, 2008 WL 4286975, at *8 (N.D. Ill. Sept.16, 2008), <u>but see</u> <u>Beloit Corp. v. C3 Datatec, Inc.</u>, 78 F.3d 586, at *2 (7th Cir. 1996) (Table) (implying that setoff should be pled as an affirmative defense under Rule 8(c)).

The defendants asserted setoff as an affirmative defense in their late-filed answer and also filed a counterclaim seeking to recover those same monies. Today's decision needn't resolve whether setoff must be pleaded as an affirmative defense or in a counterclaim because Lock didn't suffer undue prejudice from the defendants' late assertion of setoff.

"[A] delay in asserting an affirmative defense waives the defense *only* if the plaintiff was harmed as a result." <u>Best v. City of Portland</u>, 554 F. 3d 698, 701 (7th Cir. 2009) (emphasis added) (*citing* <u>Curtis v. Timberlake</u>, 436 F.3d 709, 711 (7th Cir. 2005)). The court in <u>Curtis v. Timberlake</u> affirmed the district court's ruling permitting the affirmative defense to be raised for the first time at summary judgment. 436 F.3d at 711. The court found that the plaintiff wasn't prejudiced by the affirmative defense because he was aware of the defense when he filed his complaint and confronted the defense in responding to the summary judgment motion. <u>Id.</u> "[W]here the plaintiff has an opportunity to respond to a late

affirmative defense, he cannot establish prejudice by merely showing that the case has progressed significantly since the defendants answered his case." Williams v. Lampe, 399 F.3d 867, 871 (7th Cir. 2005).

There seems little excuse for the defendants' failure to timely assert affirmative defenses. Lock specifically informed the defendants in December 2006 of their obligation to plead affirmative defenses, but the defendants didn't file their affirmative defenses until June 2007. Still, the court of appeals has made it clear that a defendant won't be deemed to waive its affirmative defense unless the plaintiff was harmed as a result. Lock was aware of the defendants' intention to plead setoff. Lock had and took the opportunity to respond to the defendants' setoff argument in reply to its motion for summary judgment. (doc. # 164, pp. 3-4). Further, the defendants have filed a counterclaim seeking to recover similar damages that comprise their claim for setoff, so it is within the interests of judicial economy to consider the defendants' claim of setoff when determining damages in this action. The court therefore reconsiders its prior ruling (doc. # 209) and permits defendants to assert setoff in this action.

The court previously found that Lock is entitled to $371,249,30 plus interest for past due rent. The defendants are entitled to setoff the $63,000 of consumables retained by Lock against this amount. The defendants also seek setoff for prepaid taxes on the property and monies received for services the defendants rendered while they possessed the nursing home facility. Lock hasn't addressed these claims, so the court provides Lock with an opportunity to file a

response within **fifteen days** from the date of this order to the defendants' claim for taxes and payment for services rendered. The defendants must file a reply within **seven days**.

VIII. CONCLUSION

The court DENIES Lock's motion to supplement its designated evidence in support of its motion for partial summary judgment for future rents (doc. # 251); GRANTS Lock's motion to strike the defendants' sur-response in opposition to motion for partial summary judgment (doc. # 205); GRANTS the defendants' motion to strike certain portions of the report of Jean L. Tipton filed in support of Lock's motion for partial summary judgment (doc. # 202); DENIES Lock's motion for partial summary judgment (doc. # 171); DENIES as moot Lock's motion to strike the expert testimony of Greg Jurgonski and Jackson Report filed in support of the defendants' response to Lock's motion for partial summary judgment (doc. # 189); GRANTS the defendants' motion for summary judgment finding that the summary judgment record doesn't contain sufficient evidence for Lock to prove actual damages for future rent (doc. # 212); DENIES as moot Lock's motion to strike the report of Bonnie Mitchell and the calculation of Greg Jurgonski (doc. # 221); and GRANTS the defendants' motion to reconsider the court's March 25, 2008 opinion and permits the defendants to assert setoff in this action (doc. # 210).

SO ORDERED.

ENTERED:  September 14, 2009

          /s/ Robert L. Miller, Jr.
Chief Judge
United States District Court